**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**v.** **Case No. 2:70-CV-00010 - BSM**

**COTTON PLANT SCHOOL DISTRICT #1, ET Al.** **DEFENDANTS**

**MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION FOR UNITARY STATUS AND DISMISSAL**

Defendant Watson Chapel School District #24 (hereafter, “WCSD” or “the District”) respectfully moves the Court to grant its motion for unitary status and dismiss the case as to the District.[1]

## I. Procedural History and Relevant Facts

The plaintiff, the United States of America (“United States”), filed this action on July 9, 1970.[2] On November 17, 1970, the Court entered an Order enjoining the District from “discriminating on the basis of race against black students attending the public schools” in the District.[3] Since at least the 2004-2005 school year, each school in the District has served a different grade span, so all students in the same grade attend the same school. On December 5, 2012, the United States notified the District in writing that it had concluded that the District had complied with its desegregation obligations in faculty and staff assignment, the administration of its gifted and talented education program, and inter-district transfers.[4]

[1] The case continues as to the England School District.
[2] See December 6, 2016 Consent Order (“Consent Order”) [Doc. No. 87-1] at §I.
[3] Id.
[4] Id.

In 2015, the District and the United States (collectively "the Parties") began negotiating a new consent order ("Consent Order") which the Court signed and entered on December 6, 2016.[5] The Consent Order required the District to ensure the non-discriminatory administration of student discipline.[6] To allow the United States to monitor the District's compliance, the District was required to submit yearly status reports and provide the United States with additional information upon request.[7]

In August 2016, even before the Court entered the Consent Order, the District worked diligently to implement its provisions.[8] Over the next few years, however, the District struggled to overcome obstacles to continuing to implement the requirements of the 2016 Consent Order. For example, in 2018, the District faced significant budget shortfalls.[9] Since approximately the 2022-2023 school year, despite continued budgetary challenges and several changes in leadership, the District has rededicated itself to compliance with the Consent Order.[10] The District is committed to continuing these measures.

## II. <u>Legal Standard</u>

The ultimate inquiry in determining whether a school district is unitary is whether the district has (1) fully and satisfactorily complied in good faith with the Court's desegregation orders for a reasonable period of time; (2) eliminated the vestiges of prior de jure segregation to the extent practicable; and (3) demonstrated a good faith commitment to the whole of the Court's orders and to those provisions of the law and the Constitution which were the predicate for judicial

---

[5] December 6, 2016 Order [Doc. No. 88].
[6] Consent Order at §§III.-IX.
[7] Id. at §X.
[8] See District 2017 Status Report, attached as Exhibit 1 to this memorandum.
[9] See District 2025 Status Report, attached as Exhibit 2 to this memorandum.
[10] Id.

intervention in the first instance.[11] A finding that a school district currently complies with its desegregation obligations and "it was unlikely that the school [district] would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved.[12]" The Court must examine "every facet of school operations," including the policies and practices that relate to the "*Green*" factors, which include student assignment, faculty and staff assignment, facilities, transportation, and extracurricular activities.[13]

## III. Argument

An examination of the 2016 Consent Decree and WCSD's current policies and practices demonstrates that the District has complied in good faith with its desegregation obligations for a reasonable period of time and should be declared unitary in all facets of its school operations. Dr. Keith McGee, WCSD's current superintendent, has attested that he believes that WCSD has complied with the provisions of the 2016 Consent Decree since his hiring in July 2024. (See Exhibit "1", Affidavit of Dr. Keith McGee, hereafter "McGee Affidavit", at ¶¶ 7, 30). Kerri McNeal, who served as the District's School Culture and Climate Specialist from circa January 2020 to June 2025, has attested that she believes that the District substantially complied with the provisions of the 2016 Consent Decree from the 2022-2023 school year through the end of her employment with the District in June 2025. (See Exhibit "2", Affidavit of Kerri McNeal, hereafter "McNeal Affidavit", at ¶¶ 7, 43). Ms. McNeal also stated that she believed the District had periods of substantial compliance between 2016 and 2022, and that consistent compliance had been achieved between 2022-2025. (Ex. 2, McNeal Affidavit, at ¶ 6).

---

[11] *See Missouri v. Jenkins*, 515 U.S. 70, 87-89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 491-92, 498 (1992); *Board of Educ. v. Dowell*, 498 U.S. 237, 248-50 (1991).

[12] *Board of Education of Oklahoma City Public Schools v, Dowell*, 498 U.S. 237, 247 (1991).

[13] *See Green v. County Sch. Bd. Of New Kent County*, 391 U.S. 430, 435, (1968).

### A. Compliance with the 2016 Consent Decree

The 2016 Consent Order was entered after the United States determined, based on its monitoring, that "during the 2014-2015 school year the District suspended and expelled Black students at high rates, significantly higher than for White students, and that District policies, procedures, and practices were responsible for both the frequency of discipline and the disparities." (Doc. No. 87-1, Consent Order, p. 2). The District and the United States then agreed on the need to reform the District's discipline practices to ensure the equal treatment of all students regardless of their race, focusing on "devising and implementing remedial measures rather than engaging in contested litigation." (*Id.*). The District has now fully and satisfactorily complied in good faith with the Court's desegregation orders, specifically the 2016 Consent Decree, for a reasonable period. The 2016 Consent Decree required the District to ensure the nondiscriminatory administration of discipline by addressing the following: (1) positive school climate, (2) code of conduct, (3) disciplinary practices, (4) involvement of law enforcement, (5) data review and analysis, (6) student, parent, guardian, and community engagement, (7) training, and (8) monitoring and enforcement. (Doc. No. 87-1, Consent Order). The District's compliance with these specific components is described below.

#### i. *Positive School Climate*

The District has complied with the Consent Order's requirement that it "transition away from using Exclusionary Discipline as the primary response to student misbehavior." (Doc. No. 87-1, Consent Order, p. 5). The District employed a School Culture and Climate Specialist from July 2016 to June 2025, specifically Dovie Burl (July 2016 to June 2018), Yalonda Keaton (June 2018 to June 2019), and Kerri McNeal (June 2019 to June 2025). (Ex. 2, McNeal Affidavit, at ¶ 7). Following Ms. McNeal's resignation, effective June 30, 2025, WCSD has assigned the duties

formerly performed by the School Culture and Climate Specialist to Assistant Superintendent Aleta Posey. (Ex. 2, McGee Affidavit, at ¶ 9). The duties of the School Culture and Climate Specialist, as most recently performed by Ms. McNeal and now assigned to Ms. Posey, are to "oversee implementation of the District's positive school climate efforts" (Doc. No. 87-1, Consent Order, p. 6) and work with teachers to ensure that disciplinary decisions were made in compliance with the code of conduct, and thus the Consent Order. (Ex. 2, McNeal Affidavit, at ¶ 8).

For the 2017-2018 school year, WCSD also hired four individuals to serve as behavioral interventionists and implement positive behavioral interventions and supports ("PBIS"). (Ex. 2, McNeal Affidavit, at ¶ 9). The District used PBIS and the behavioral interventionists as a means of complying with the requirements of section III of the Consent Order. (Ex. 2, McNeal Affidavit, at ¶ 10). The District's inconsistent compliance with the Consent Order largely relates to its inconsistency in staffing the behavioral interventionist positions and implementing PBIS. In 2019, due to budgetary constraints, loss of enrollment, and loss of funding associated with enrollment, the behavior interventionist positions were eliminated by reduction in force. (Ex. 2, McNeal Affidavit, at ¶ 11). Additionally, the COVID-19 pandemic impacted all facets of school operations, including compliance with the 2016 Consent Order. (Ex. 2, McNeal Affidavit, at ¶ 12). District administration also changed several times over the course of this period, with the following superintendents serving the District: Connie Hathorn (2016-2018), Dr. Jerry Guess (2018-2021), Dr. Andrew Curry (2021-2022), Tom Wilson (2022-2024), and Dr. Keith McGee (2024-present). (Ex. 2, McNeal Affidavit, at ¶ 13).

The District restored the behavior interventionist position during the 2022-2023 school year and employed four individuals in that position. (Ex. 2, McNeal Affidavit, at ¶ 14). The District also reestablished the use of PBIS during the 2022-2023 school year. (Ex. 2, McNeal Affidavit, at

¶ 15). During the 2023-2024 school year, the District employed four behavioral interventionists. (Ex. 2, McNeal Affidavit, at ¶ 16). Due to financial constraints caused by declining enrollment and increased personnel costs, during the 2024-2025 school year, the District employed two behavioral interventionists, one assigned to the elementary schools and one assigned to the secondary schools. (Ex. 2, McNeal Affidavit, at ¶ 17). For the 2025-2026 school year, the District has two behavioral interventionists on staff. (Ex. 2, McGee Affidavit, at ¶ 12).

Ms. McNeal coordinated the annual professional development training required in section III, paragraph 7 of the Consent Decree each school year from 2017-2018 to 2024-2025. (Ex. 2, McNeal Affidavit, at ¶ 18). The training was conducted by Assistant Superintendent Aleta Posey and Willie Gulley, instructional facilitator, prior to the 2025-2026 school year. (Ex. 1, McGee Affidavit, at ¶ 16).

Since 2022-2023, the District has consistently complied with the requirements of Section III of the Consent Order.

ii. *Code of Conduct*

Following entry of the 2016 Consent Order, WCSD implemented a code of conduct for all students. (Ex. 2, McNeal Affidavit, at ¶ 19). The code of conduct was initially approved by the United States prior to the 2017-2018 school year. (Ex. 2, McNeal Affidavit, at ¶ 20). Since then, the Code of Conduct has been revised and reapproved by both the District and the Plaintiff for each successive school year. (Ex. 2, McNeal Affidavit, at ¶ 21). In compliance with section IV, paragraph 9 of the Consent Order, the Code of Conduct "list[s] all disciplinary infractions or categories of disciplinary infractions and divide[s] them into" three levels:

> Level 1 – offenses that do not threaten safety or significantly disrupt the operation of the classroom or another school activity.
> Level 2 – offenses that threaten safety or significantly disrupt the operation of the classroom or another school activity but do not qualify as a Level 3 infraction.
> Level 3 – offenses that constitute a substantial threat to physical safety or that are serious crimes (e.g., possession of firearms or other weapons or burglary).

(Doc. No. 87-1, Consent Order, p. 8; Ex. 2, McNeal Affidavit, at ¶ 22). The Code of Conduct also prescribes the consequences for each offense or category of offense. (Ex. 2, McNeal Affidavit, at ¶ 23). At all times since the Code of Conduct was established prior to the 2017-2018 school year, the Code of Conduct has prohibited corporal punishment. (Ex. 2, McNeal Affidavit, at ¶ 24).

iii. *Disciplinary Practices*

In accordance with the Consent Order, since the 2017-2018 school year, the District has substantially complied with the requirement that discipline be administered according to the Code of Conduct. The District provides due process to any student assigned to out-of-school suspension, recommended for expulsion, or referred to the Alternative Education Program based on "disruptive behavior." (Doc. No. 87-1, Consent Order, p. 10; Ex. 2, McNeal Affidavit, at ¶ 25). Since the 2017-2018 school year, all of the District's schools have had in-school suspension and either lunchtime or after-school detention. (Ex. 2, McNeal Affidavit, at ¶ 26).

The comprehensive needs assessment required by Section V, paragraph 18, was conducted during the 2017-18 school year and shared with the United States. (Ex. 2, McNeal Affidavit, at ¶ 27). Additionally, the District has substantially complied with the Consent Order's requirement that functional behavioral assessment ("FBA") or behavior management plan ("BMP") be conducted for students with persistent patterns of misbehavior. (Ex. 2, McNeal Affidavit, at ¶ 28).

iv. *Involvement of Law Enforcement*

The District used school resource officers ("SROs") during the 2016-2017 and 2017-2018 school years. (Ex. 2, McNeal Affidavit, at ¶ 29). The District contracted with a private security

company for the 2018-2019, 2019-2020, 2020-2021, 2021-2022, 2022-2023, and 2023-2024 school years. (*Id.*). Additionally, a Jefferson County Sheriff's Office deputy served as the District's director of security from at least the beginning of Ms. McNeal's employment in July 2015 through the end of the 2023-2024 school year. (*Id.*). Beginning with the 2024-2025 school year, the District hired a new director of security and additional security officers, who are directly employed by the District. (*Id.*).

Law enforcement is involved only "in response to offenses that constitute an imminent and substantial threat to physical safety or that are serious crimes." (Doc. No. 87-1, Consent Order, p. 12; Ex. 2, McNeal Affidavit, at ¶ 30; Ex. 1 McGee Affidavit at ¶ 13). To the best of both Dr. McGee and Ms. McNeal's knowledge, SROs and employees with security responsibilities have received yearly training regarding "their roles and responsibilities including working with youth, practices to improve school climate, and the consequences of student involvement in the criminal and juvenile justice systems." (Doc. No. 87-1, Consent Order, p. 12, ¶ 23; Ex. 2, McNeal Affidavit, at ¶ 31; Ex. 1 McGee Affidavit at ¶ 14). The District had a memorandum of agreement with the Jefferson County Sheriff's Office during the time it provided SROs to the District, and with the private security company the District contracted with between 2018 and 2024. (Ex. 2, McNeal Affidavit, at ¶ 32). The District does not currently have any memorandum of agreement with a law enforcement agency regarding the provision of SROs to the District, as all security personnel are currently employees of the District. (Ex. 1, McGee Affidavit, at ¶ 15).

v. *Data Review and Analysis*

The District has substantially complied with Section VII of the Consent Order. In accordance with the requirements of Section VII, the District has submitted sample disciplinary reports once per semester, and upon the request of the United States, since the 2017-2018 school

year. (Ex. 2, McNeal Affidavit, at ¶ 33). All principals and the superintendent have also conducted reviews of discipline data, at a minimum of once per semester since the second semester of the 2016-2017 school year, for the purpose of identifying disparities and, if necessary, taking appropriate remedial measures to address said disparities. (Ex. 2, McNeal Affidavit, at ¶ 34).

vi. *Student, Parent, Guardian, and Community Engagement*

The District has substantially complied with Section VIII of the Consent Order by hosting student assemblies and classroom meetings to explain disciplinary rules and behavior expectations at various times since the 2017-2018 school year. (Ex. 2, McNeal Affidavit, at ¶ 35). Informational sessions for parents, guardians, and other interested members of the WCSD community have been held at least once per school year since the 2016-2017 school year. (Ex. 2, McNeal Affidavit, at ¶ 36).

vii. *Training*

Administrators and instructional staff received training on the Code of Conduct before it was initially implemented before the 2017-2018 school year and annually each school year thereafter through 2024-2025. (Ex. 2, McNeal Affidavit, at ¶ 37). The 2025-2026 training was conducted on during the pre-school professional training prior to the 2025-2026 school year by Aleta Posey, Assistant Superintendent, and Willie Gulley, Instructional Facilitator. (Ex. 2, McGee Affidavit, at ¶ 16).

WCSD also provided all District principals with training regarding the data review and analysis portions of the Consent Order prior to the second semester of the 2016-2017 school year. (Ex. 2, McNeal Affidavit, at ¶ 38). New principals hired subsequent to that date but before June 30, 2025 received similar training conducted by Ms. McNeal. (Ex. 2, McNeal Affidavit, at ¶ 39).

viii. *Monitoring and Enforcement*

In compliance with Section X of the Consent Order, the District has submitted annual status reports to the United States on or around January 31 each year since 2017. (Ex. 2, McNeal Affidavit, at ¶ 40). The District has cooperated with the United States' monitoring efforts, including but not limited to by submitting documentation related to both discipline policies and implementation of discipline to the United States at various times throughout the school year as described in the preceding paragraphs and whenever requested by the United States. (Ex. 2, McNeal Affidavit, at ¶ 41). The District has also submitted to at least two site visits by representatives of the United States over the last several years. (Ex. 2, McNeal Affidavit, at ¶ 42). The District has made commitments to continue these efforts which ensure that the District will not return to its former ways. (Ex. 1, McGee Affidavit, at ¶ 31).

**B. Analysis of the *Green* Factors**

For the 2024-2025 school year, the District operated four schools: Edgewood Elementary School served kindergarten and first grade students; Coleman Elementary School served grades 2-5; Watson Chapel Junior High served grades 6, 7, and 8; and Watson Chapel High School served grades 9-12. (Ex. 1, McGee Affidavit, at ¶ 17). According to records maintained by the Arkansas Department of Education's Division of Elementary and Secondary Education ("DESE"), total enrollment for the District during the 2024-2025 school year was approximately 1,552 students, of which 1,365 (88.0%) were Black. (Ex. 1, McGee Affidavit, at ¶ 18). All students in each grade, regardless of race, attend the same school. (Ex. 1, McGee Affidavit, at ¶ 19). All students, regardless of race, enjoy the same facilities. (Ex. 1, McGee Affidavit, at ¶ 20). Therefore, the District has eliminated any vestiges of prior segregation in between-school student assignment. For the same reason, the District has eliminated the vestiges of prior segregation in facilities. The

District is in the process of building a new, state-of-the-art high school, which will replace the current WCHS building and house students in grades 9-12. (Ex. 1, McGee Affidavit, at ¶ 21). The new high school is scheduled to open to students in August 2026. (Ex. 1, McGee Affidavit, at ¶ 22).

The District has also eliminated any vestiges of prior segregation in faculty and staff hiring and assignment. (Ex. 1, McGee Affidavit, at ¶ 23). For the 2025-2026 school year, the District employs 126 licensed teachers, of which 91 are Black (72%), and 112 classified staff members, of which 84 are Black (75%). (Ex. 1, McGee Affidavit, at ¶ 24). Dr. McGee is not aware of any complaints that the District has engaged in intentional discrimination in its hiring of faculty and staff. (Ex. 1, McGee Affidavit, at ¶ 25). The United States has authorized the District to state that it is also unaware of any complaints regarding staffing.

For the 2025-2026 school year, the District is operating 18 bus routes. (Ex. 1, McGee Affidavit, at ¶ 26). Since his employment with the District began in 2024, to the best of Dr. McGee's knowledge, students have been assigned to bus routes based upon the geographical location of their home and school bus capacity. (*Id.*). For the 2025-2026 school year, the District used an electronic service called TransFinder to create the District's bus routes. (*Id.*). The District's bus routes serve all of the District's students, and considerations in determining those routes include the number of buses owned by and available to the District, the number of bus drivers employed by the District, the length of time needed to drive all routes, and minimizing the amount of time students spend on a bus each day. (*Id.*). Students are assigned to their respective buses on a non-racial basis. (*Id.*). Dr. McGee is not aware of any complaints regarding transportation. (Ex. 1, McGee Affidavit, at ¶ 26). The United States has authorized the District to state that it is also unaware of any complaints regarding student transportation.

Watson Chapel Junior High and Watson Chapel High School offer many extracurricular activities, including but not limited to athletic programs such as football, basketball, volleyball, baseball, softball, and track, and clubs such as Beta Club, National Honor Society, National Junior Honor Society, Robotics Club, Gentlemen's Club, Real Estate Club, and Ladies' Club. (Ex. 1, McGee Affidavit, at ¶ 28). Dr. McGee is not aware of any complaints regarding access to participation in extracurricular activities. (Ex. 1, McGee Affidavit, at ¶ 29). The United States has authorized the District to state that it is also unaware of any complaints regarding extracurricular activities.

## IV. Conclusion

The District has fully and satisfactorily complied in good faith with the Court's desegregation orders for a reasonable period. The District has complied with the Consent Order for the last several years despite many budgetary and logistical challenges. It has submitted status reports to the United States and cooperated with the United States' monitoring efforts. The District has also made commitments to continue these efforts which ensure that the District will not return to its former ways. For all of the reasons stated herein, the District moves the Court to grant its unopposed motion for unitary status and dismiss the case as to the District with prejudice.

Respectfully Submitted

/s/ Whitney F. Moore
Whitney F. Moore (Ark. Bar No. 2009193)
Whitney F. Moore, P.A.
23 Huntington Road
Little Rock, Arkansas 72227
Phone: (870) 818-5490
Email: whitney@aprobertslaw.com

and

W. Cody Kees (Ark. Bar No. 2012118)
Bequette, Billingsley & Kees, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax: (501) 374-5092
Email: ckees@bbpalaw.com

Attorneys for Watson Chapel School District #24